# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

HABIBOLLAH TABATABAI,

            Plaintiff,

    v.                                    Case No. 08-CV-227

WEST COAST LIFE INSURANCE CO.,

            Defendant.

_____

## ORDER

On January 29, 2008, plaintiff Habibollah Tabatabai ("Mr. Tabatabai") filed a complaint in the Milwaukee County Circuit Court, alleging a "breach of contract" claim and a "bad faith" claim against West Coast Life Insurance Company ("West Coast Life") and a "tortious interference" claim against The O'Brien Financial Group, Inc. ("O'Brien Financial"). The parties' dispute is in reference to insurance coverage and whether the plaintiff's wife, Firouzeh Keshmiri ("Ms. Keshmiri"), was covered by a conditional receipt agreement when she was diagnosed with brain cancer and later died.

On March 14, 2008, West Coast Life removed this action to the U.S. District Court for the Eastern District of Wisconsin. (Docket #1). West Coast Life alleges jurisdiction lies under 28 U.S.C. § 1332, as the action is between citizens of different states, and the amount in controversy exceeds $75,000. (Notice of Removal ¶ 1-2, 10). West Coast Life is incorporated in Nebraska and has its principal place of business in Alabama, and plaintiff is a citizen of Wisconsin. In its Notice of Removal,

West Coast Life claimed that O'Brien Financial, a citizen of Wisconsin, was wrongfully joined to the lawsuit because, as an insurance agent, O'Brien Financial was not a third party and, therefore, could not be held liable for tortious interference. Therefore, on May 2, 2008, O'Brien Financial filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) as to plaintiff's claim against it. (Docket #11). In response, on July 17, 2008, plaintiff voluntarily dismissed its sole claim against O'Brien Financial. Then, on June 26, 2009, plaintiff filed an Amended Complaint asserting four causes of action against West Coast Life: 1) breach of contract; 2) estoppel; 3) bad faith; and 4) negligence. (Docket #23). On May 17, 2010, West Coast Life filed a Motion for Summary Judgment. (Docket #32). In Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, plaintiff notes that he will only pursue his breach of contract claim, including breach of the implied duty of good faith and fair dealing. (Pl.'s Br. 14 n. 2) (Docket #45). Because plaintiff has voluntarily withdrawn three of his claims, the court will grant summary judgment for the defendant as to plaintiff's estoppel, bad faith, and negligence claims. *See Aviles v. Cornell Forge Co.*, 183 F.3d 598, 601 (7th Cir. 1999). After carefully considering the parties' submissions regarding the plaintiff's breach of contract claim, the court finds that the defendant is entitled to summary judgment as to this claim as well.

# DISCUSSION

## I. The Facts

On June 17, 2006, plaintiff's late wife, Ms. Keshmiri, completed and signed an application for life insurance from West Coast Life. (Am. Compl. ¶ 11, Ex. A; Answer to Am. Compl. ¶ 11; Decl. D. Alvine ¶ 1). Darrell Alvine ("Mr. Alvine"), a licensed insurance intermediary, and the neighbor of the plaintiff and Ms. Keshmiri, provided Ms. Keshmiri with the insurance application. (Decl. D. Alvine ¶ 1; Plaintiff's Responses to Defendant's Statement of Proposed Facts (DPFOF) ¶ 7). In the application, Ms. Keshmiri requested a 20-year level term policy in the amount of $500,000. (Am. Compl. ¶ 11, Ex. A). A portion of the application labeled "Agent's Report" contains the following premium rate classification options: "Super Preferred," "Preferred," "Standard," "Rated," or "Other." (Am. Compl. ¶ 11, Ex. A p. 5 of 9; Answer Am. Comp. ¶ 11). The box next to the "Super Preferred" classification is checked on Ms. Keshmiri's application. (Am. Compl. ¶ 11, Ex. A p. 5 of 9). The parties dispute whether Ms. Keshmiri affirmatively requested or had knowledge her application specified the "super preferred" classification. The plaintiff claims that the "Agent's Report" portion of the application was never presented to Ms. Keshmiri for review or signature, and that she never requested the "super preferred" rates. (Pl.'s Responses DPFOF ¶¶ 9-10; Tabatabai Aff. ¶ 6). However, Mr. Alvine's Declaration states that, when he met with Ms. Keshmiri, he described the different life insurance

classifications and Ms. Keshmiri elected to apply for coverage under the "super preferred" classification. (Decl. D. Alvine ¶ 2).

After filling out the application, Ms. Keshmiri submitted a check for $100 that was deemed "an amount equal to the premium due on the policy applied for." (Am. Compl. ¶ 11, Ex. A p. 8 of 9). West Coast Life deposited and cashed this check on July 12, 2006. (Defendant's Responses to Plaintiff's Proposed Findings of Fact (PPFOF) ¶ 26). In exchange for submitting a payment with her application, Ms. Keshmiri signed and entered into a Conditional Receipt Agreement ("CRA") with West Coast Life. (Am. Compl. ¶ 11, Ex. A p. 8 of 9; Pl.'s Responses DPFOF ¶ 12). According to its terms, the CRA provides a "limited amount of insurance, for a limited period of time, and then only if all the terms and conditions of [the] Agreement are met." (Am. Compl. ¶ 11, Ex. A p. 8 of 9). The CRA also provides, in pertinent part:

CONDITIONS UNDER WHICH INSURANCE MAY BECOME EFFECTIVE PRIOR TO POLICY DELIVERY

Unless each and every condition below has been fulfilled exactly, no insurance will become effective prior to policy delivery to the Owner:

(A) on the Effective Date the Proposed Insured(s) is (are) insurable exactly as applied for under the Company's printed underwriting rules for the plan, amount and premium rate class applied for; . . .

(C) the Proposed Insured(s) has/have completed all examinations and/or tests requested by the Company; . . .

TERMINATION AND REFUND OF PREMIUM

There shall be no insurance coverage under this Agreement and this Agreement shall be void if:

. . .

(B) if the application to which this Agreement was attached is not approved as applied for by the Company within ninety business days from its date.

(Am. Compl. ¶ 11, Ex. A p. 8 of 9; Answer Am. Compl. ¶ 11). As required by the plan rules and the CRA, a paramedical examiner met with Ms. Keshmiri on June 28, 2006, at which time Ms. Keshmiri provided blood and urine specimens. (Decl. R. Welker ¶ 4, Ex. B; Am. Compl. ¶ 16; Answer Am. Compl. ¶ 16). The lab results were analyzed and were promptly sent to Ms. Keshmiri. (Decl. R. Welker ¶ 5; Mitchell Aff. ¶ 14). Though West Coast Life's underwriting standards for test results varied depending on the type and amount of coverage being sought, Ms. Keshmiri's lab results contained both her results and a column entitled the "usual clinical range" or "reference range." (Mitchell Aff. ¶ 15; Decl. R. Welker, Ex. B). Each result that was outside of the reference range was marked High with an "H". (Decl. R. Welker, Ex. B; Tabatabai Aff. ¶ 8, Ex. B, p. 3 of 5). Other than this indication of a "High" result, the results and the letter accompanying them did not state that the results would negatively impact Ms. Keshmiri. (PPFOF ¶ 24).

The most significant disparities between Ms. Keshmiri's results and the usual clinical range or reference range numbers were her cholesterol level of 229 (usual clinical range of 140-199) and her protein/creatinine level of .52 (reference range of

0-.20). (Decl. R. Welker ¶ 4, Ex. B). Several of Ms. Keshmiri's other results were also outside the reference range. (Decl. R. Welker, Ex. B). It is undisputed that Ms. Keshmiri's cholesterol level of 229 and her cholesterol/HDL level of 3.8, did not qualify her for the "super preferred" rating. (Pl.'s Responses DPFOF ¶ 23). Furthermore, at the time of Ms. Keshmiri's application, and the underwriting thereof, West Coast Life's "super preferred," "preferred," and "standard" classifications required the applicant to be classified as a standard risk medically. (DPFOF ¶ 24; Decl. R. Welker ¶ 7). The underwriting department's notes show that the results were tentatively rated as either a decline or a non-standard, rated +50 risk, ("+50 per Genre assuming no DM otherwise pp"), meaning Ms. Keshmiri would not technically be eligible for the "super preferred," "preferred," or "standard" classifications at their regular premiums; however if she was accepted as an insured, her premiums would have been 50 percent higher than that of a person who qualified for the "standard" classification and more than double the premium of the "super preferred" classification. (Decl. R. Welker ¶ 8, Ex. C).

Based upon these lab results, on July 5, 2006, West Coast Life ordered its insurance broker, O'Brien Financial, to obtain Ms. Keshmiri's medical records file from her personal physician. (Decl. R. Welker ¶ 9). The next day, on July 6, 2006, West Coast Life also requested that O'Brien Financial obtain a second urine specimen from Ms. Keshmiri. (Pl.'s Responses DPFOF ¶ 27; Decl. R. Welker ¶ 10). On July 23, 2006, Mr. Alvine alerted O'Brien Financial that Ms. Keshmiri is

"expecting a call" and that O'Brien Financial should contact Ms. Keshmiri to arrange for a second urine analysis. (Decl. B. Reuter ¶ 7, Ex. F). The plaintiff disputes that Mr. Alvine ever contacted Ms. Keshmiri so that she would be expecting a call for a second urine sample. (Pl.'s Responses DPFOF ¶ 29; Tabatabai Aff. ¶ 10). Although the parties are unclear as to the date, it is undisputed that Ms. Keshmiri received a voicemail from West Coast Life sometime in July 2006 or August 2006. (Tabatabai Aff. ¶ 11; Pl.'s Responses DPFOF ¶ 34). Defendant claims the voicemail message was left to set up an appointment to obtain a second urine sample from Ms. Keshmiri. (DPFOF ¶ 34). Plaintiff claims the voicemail message was not received by Ms. Keshmiri until after West Coast Life had rejected her application. (Tabatabai Aff. ¶ 11-12). Ms. Keshmiri never submitted a second urine specimen. (Pl.'s Responses DPFOF ¶ 35).

Meanwhile, on July 22, 2006, Ms. Keshmiri went to an urgent care facility complaining of symptoms of dizziness. (Pl.'s Responses DPFOF ¶ 31). Ms. Keshmiri was admitted to the hospital on July 22, 2006, where she was diagnosed with a brain tumor. (Pl.'s Responses DPFOF ¶ 32). On July 25, 2006, Ms. Keshmiri underwent surgery to remove her brain tumor. (Pl.'s Responses DPFOF ¶ 33). Mr. Alvine learned that Ms. Keshmiri was hospitalized with a brain tumor on Sunday, July 23, 2006. (PPFOF ¶ 30). West Coast Life made the decision to refuse a policy to Ms. Keshmiri based on "recent brain surgery" on August 9, 2006. (PPFOF ¶ 37; Decl. R. Welker, Ex. H). Ms. Keshmiri died on October 13, 2007. (Am. Compl. ¶ 37).

## II.    Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). By its plain language, this standard provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See id.* at 248. "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the nonmoving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.* 554 F.3d 1133, 1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)). Once the movant satisfies this initial burden, the burden then shifts to the nonmoving party who "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248). There is no issue for trial unless the nonmoving party demonstrates that there is *sufficient*

*evidence* in the nonmoving party's favor for a jury to return a verdict for that party. *Liberty Lobby*, 477 U.S. at 249. If the evidence is "merely colorable" or is "not significantly probative," summary judgment may be granted. *Id.* In ruling on a summary judgment motion, the court must view the evidence plus all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007).

### III.    Breach of Contract Claim

In his complaint, the plaintiff first asserts that once Ms. Keshmiri completed the urine and blood testing required of her on June 28, 2006, she was insured by West Coast Life pursuant to the CRA. (Am. Compl. ¶ 40). Thus, the plaintiff contends that West Coast Life breached its contract of insurance with Ms. Keshmiri by failing to pay benefits promised by the CRA to the plaintiff. On the other hand, West Coast Life argues it is entitled to summary judgment on the plaintiff's breach of contract claim because the CRA never became effective due to Ms. Keshmiri's failure to satisfy a number of conditions precedent that were necessary for the CRA coverage to go into effect. (Def.'s Br. 1). The plaintiff counters that if any of the conditions precedent to the CRA were not satisfied, the fault rests with West Coast Life because it failed to communicate its request for a second urine test to Ms. Keshmiri. The plaintiff relies on the "doctrine of prevention" in arguing that West Coast Life's failure to exercise its duties to effect performance of the conditions precedent

prevents it from now invoking the condition in its defense. (Pl.'s Br. in Opp'n 1-2).

Lastly, the plaintiff argues that West Coast Life breached the implied duty of good

faith and fair dealing by failing to continue underwriting Ms. Keshmiri's policy without

regard to the change in her health.

### A.      The Conditional Receipt Agreement and the Conditions Precedent

The conditional receipt or CRA is a device used by the life insurance industry

through which an applicant is immediately insured upon payment of the initial

premium at the time of application and upon satisfaction of various conditions

precedent to coverage. *See Fox v. Catholic Knights Ins. Co.*, 263 Wis.2d 207, 665

N.W.2d 181 (Wis. 2003)*; see also Brown v. Equitable Life Ins. Co. of Iowa*, 60 Wis.

2d 620, 625, 211 N.W.2d 431 (Wis. 1973).[1] It is well-settled under Wisconsin law

that "'[c]ontracts of insurance rest upon and are controlled by the same principles of

law that are applicable to other contracts, and parties to an insurance contract may

provide such provisions as they deem proper as long as the contract does not

contravene law or public policy.'" *Brown v. Equitable Life Ins. Co.*, 60 Wis.2d at 628

(quoting *McPhee v. American Motorists Ins. Co.,* 57 Wis.2d 669, 673, 205 N.W.2d

152, 155 (1973)). Thus, the language of a CRA is seen to clearly express the

intention of the contracting parties. *Id.* at 627. Furthermore, the effectiveness of a

---

[1]The current matter is before the court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. In diversity cases, federal courts apply federal procedural law and state substantive law. 28 U.S.C. § 1332; *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 795 (7th Cir. 1999) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Therefore, the court will apply Wisconsin substantive law.

CRA may be made dependent upon the fulfillment of specifically named conditions precedent,[2] "such as payment of the first full premium, approval or acceptance of the application by the insurer, completion of a medical examination, insurability, issuance or delivery of the policy, or any combination of the above." *Fox v. Catholic Knights Ins. Co.*, 263 Wis.2d at 222. Accordingly, the conditions must be met in order for a contract of temporary insurance to exist. *Id.*

In this case, the language of the CRA is unambiguous and provides that insurability and completion of all tests or examinations requested by West Coast Life shall be conditions precedent and, thus, must be satisfied prior to the effectiveness of coverage . (Am. Compl. ¶ 11, Ex. A p. 8 of 9).[3] The conditions also do not appear to be against public policy. Therefore, in this case, an interim contract of insurance would arise only upon West Coast Life's good faith determination that the applicant

---

[2]A condition precedent is "[a]n event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1979).

[3]The CRA at issue here states in pertinent part:

> CONDITIONS UNDER WHICH INSURANCE MAY BECOME EFFECTIVE PRIOR TO POLICY DELIVERY
>
> Unless each and every condition below has been fulfilled exactly, no insurance will become effective prior to policy delivery to the Owner:
>
> (A) on the Effective Date the Proposed Insured(s) is (are) insurable exactly as applied for under the Company's printed underwriting rules for the plan, amount and premium rate class applied for; . . .
>
> (C) the Proposed Insured(s) has/have completed all examinations and/or tests requested by the Company; . . . .

was insurable exactly as applied for and upon the applicant's completion of all requested tests and examinations. *Cf. Brown v. Equitable Life Ins. Co.*, 60 Wis.2d at 628. However, if West Coast Life deemed Ms. Keshmiri uninsurable exactly as applied for and/or she failed to complete all requested tests, then no contract of insurance would have arisen between the parties.

### 1. Required Medical Tests

The court finds that the defendant has met its initial burden of showing that no factual dispute exists concerning Ms. Keshmiri's failure to complete all examinations and/or tests requested by West Coast Life and that the defendant is entitled to judgment as a matter of law on this issue. As previously noted, the completion of all requested tests or examinations was a condition precedent to the effectiveness of the CRA. Therefore, if Ms. Keshmiri failed to submit to all requested tests, then the CRA never became effective. West Coast Life has offered evidence that it requested a repeat urine test and that Ms. Keshmiri never submitted to it before the insurance company postponed the underwriting of her application due to her recent brain surgery.

It is undisputed that the only time Ms. Keshmiri provided blood and urine specimens was on June 28, 2006. (Def.'s Resp. to PPFOF ¶ 20). Shortly after receiving the initial blood and urine test results from Ms. Keshmiri which showed high results in several fields – most notably her cholesterol/HDL levels and her protein/creatinine levels – on July 6, 2006, West Coast Life requested that O'Brien

Financial obtain a second urine specimen from Ms. Keshmiri. (Decl. R. Welker ¶ 10, Ex. E).  Though this request was not communicated directly to Ms. Keshmiri as of July 6, 2006, the communication between West Coast Life and O'Brien Financial commenced a chain of emails and phone calls ultimately leading to a direct request for a urine sample from Ms. Keshmiri.

First, on July 10, 2006, O'Brien Financial advised Mr. Alvine that West Coast Life wanted another urine specimen from Ms. Keshmiri and also asked him whether it should go forward with the request. (Decl. B. Reuter ¶ 7, Ex. F).  On July 23, 2006, Mr. Alvine sent an email to O'Brien Financial stating, "Please contact [Ms.] Keshmiri to complete whatever is necessary. She is expecting a call." (Decl. B. Reuter ¶ 7, Ex. F).  The court finds it reasonable to infer from Mr. Alvine's email that Ms. Keshmiri was made aware of West Coast Life's request for a second urine test sometime before July 23, 2006, when that email was sent.[4]

The plaintiff attempts to place this fact in issue by arguing that Mr. Alvine never informed Ms. Keshmiri that a second urine test was necessary. (Tabatabai Aff. ¶ 8-9).  First the court notes that the plaintiff supports this claim only through his own

---

[4]Not only does the email tend to show that Mr. Alvine informed Ms. Keshmiri of the need for a repeat test before she was hospitalized, but it is undisputed that Mr. Alvine had many opportunities to inform the plaintiff's wife of the request before she was hospitalized on July 23, 2006.  The two families were neighbors and interacted almost daily  between July 4, 2006, and July 23, 2006.  (Def.'s Resp. PPFOF ¶¶ 31-32).

affidavit. (*See* PPFOF ¶ 29; Tabatabai Aff. ¶ 9).[5]  Affidavits offered to support or

refute the grant of summary judgment must be made on personal knowledge.  *See*

Fed. R. Civ. P. 56(e)(1).  Furthermore, the affidavit must establish the basis for that

personal knowledge whether through observation or first-hand personal experiences.

*Visser v. Packer Engineering Assocs. Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  The

only conceivable foundation plaintiff offers in support of this fact is his statement that

he and his wife "discussed this matter many times after she became ill."  (Tabatabai

Aff. ¶ 9).  Yet,  if plaintiff's knowledge of this proposed fact is based on a discussion

that he had with Ms. Keshmiri, then it is likely inadmissible hearsay, and a party may

not rely on inadmissible hearsay in opposing a motion for summary judgment.  *See*

Fed. R. Evid. 802; *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  "'Hearsay'

is a statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid.

801(c); *United States v. Harris*, 281 F.3d 667, 671 (7th Cir.  2002).   Any statements

made by Ms. Keshmiri to her husband about Mr. Alvine's failure to inform her of the

need for a second urine test, and repeated by the plaintiff in his affidavit, were not

made at a trial or hearing, and the plaintiff now seeks to use them to prove that Mr.

---

[5]The court notes that significant portions of the plaintiff's proposed findings of fact are based entirely on the plaintiff's affidavit.  The court has limited its analysis of the propriety of these findings to the material facts at stake in this case.  However, it appears that many of the plaintiff's findings would likely be inadmissible on summary judgment because they are speculative and not made with personal knowledge. The court also takes issue with the legal posturing that plaintiff includes in his proposed findings of fact. *See* PPFOF ¶ 51 ("West Coast Life's agents failed to act reasonably or promptly . . ."). This is not a "fact" and is unhelpful to the court in  trying to determine what facts are truly disputed for the purposes of summary judgment.

Alvine never informed Ms. Keshmiri of the need for a second test. Thus, the proposed fact meets the definition of hearsay and does not appear to fit within any exceptions to the hearsay rule. Therefore, the court must find that it is inadmissible to refute a grant of summary judgment.

The court notes that it is somewhat suspicious that Mr. Alvine's declarations filed in this case do not attest that he informed Ms. Keshmiri before she was hospitalized that West Coast Life requested a second urine test. However, even if the court assumes Mr. Alvine never informed Ms. Keshmiri of the request, independent evidence demonstrates that West Coast Life did request a second test, if not through Mr. Alvine, then through a nurse at the exam facility. Mr. Tabatabai admits that he and his wife received a voicemail message either in late July 2006 or early August 2006, from a nurse, requesting a second urine specimen. (Tabatabai Aff. ¶ 8-9). Therefore, even if Mr. Alvine never informed Ms. Keshmiri that a second urine specimen was required, it appears that West Coast Life did eventually request another urine test from Ms. Keshmiri.

The plaintiff also claims that if West Coast Life did request a second urine specimen, that request did not come until after West Coast Life postponed the underwriting of Ms. Keshmiri's application on August 9, 2006. Therefore, the plaintiff argues that on June 28, 2006, when Ms. Keshmiri submitted to the first blood and urine tests, she had satisfied the condition precedent because she had completed the only test actually requested of her before her application was rejected. Leaving

aside the issue of whether Ms. Keshmiri was actually insurable based on the June 28, 2006 test results, the evidence before the court demonstrates that West Coast Life did request a second urine specimen *before* it rejected Ms. Keshmiri's application. An email sent from O'Brien Financial to Mr. Alvine on August 4, 2006, confirms that the exam facility had attempted to call Ms. Keshmiri some time before that date to request the second urine specimen, but received no answer and no answering machine to leave a message. (Decl. R. Welker, Ex. 6).[6]

Consequently, though it recognizes the inefficiency of the second request's circuitous route – from West Coast Life, to O'Brien Financial, to Mr. Alvine, back to O'Brien Financial, to the exam facility, and finally to Ms. Keshmiri – the court also appreciates that this labyrinthine procedure is not all that uncommon in a bureaucratic setting, including that of a large insurance operation. Indeed, it appears that West Coast Life's CRA anticipates such a delay in the processing of an application and in the determination of insurability, as it provides for a ninety-day period for the insurance company to approve the application before the CRA is considered void. (Am. Compl. ¶ 11, Ex. A). Accordingly, the court finds that the plaintiff has not set forth specific facts to rebut the defendant's showing that no

---

[6] The court is sympathetic to the fact that Ms. Keshmiri was hospitalized for the last part of July 2006 and most of August 2006, as well as the fact that the plaintiff spent most of his time at the hospital with his wife during this period. Thus, the court appreciates that the plaintiff and Ms. Keshmiri had little opportunity to learn, through phone calls to their home, of any attempted request on behalf of West Coast Life for a second urine specimen. Yet, even so, the evidence tends to show that the defendant made several attempts to contact Ms. Keshmiri regarding the need for a second test.

genuine issue exists for trial as to Ms. Keshmiri's failure to satisfy this condition precedent.

### 2. Insurability

The court also finds that the defendant has met its initial burden of showing that no genuine factual dispute exists concerning Ms. Keshmiri's failure to satisfy the insurability condition of the CRA and that the defendant is entitled to judgment as a matter of law. First, the CRA explicitly required that Ms. Keshmiri be insurable "exactly as applied for under the Company's printed underwriting rules for the plan, amount and *premium rate class* applied for" before interim insurance coverage under the CRA became effective. The fact that Ms. Keshmiri applied for the "super preferred" rate classification is supported by Mr. Alvine's declaration in which he claims he described the different classifications to Ms. Keshmiri and she elected the "super preferred" class. (Decl. D. Alvine ¶ 2). Mr. Alvine was present during Ms. Keshmiri's review and signing of the application and, therefore, he had personal knowledge of whether or not she assented to the classification. (Decl. D. Alvine ¶ 2). Second, the box next to the "super preferred" classification is checked on the Agent's Report portion of the application, making it reasonable to infer that Ms. Keshmiri either requested the designation or assented to it. (Am. Compl. ¶ 11, Ex. A p. 5 of 9; Answer Am. Comp. ¶ 11). Lastly, the Amended Complaint filed by the plaintiff alleges that "[t]rue and correct copies of the West Coast Life application materials ("Application") *presented* to Ms. Keshmiri by Mr. Alvine are attached hereto

as Exhibit A." (Am. Compl. ¶ 11) (emphasis added). As previously noted, the application materials attached as Exhibit A to the Amended Complaint show that the box next to the "super preferred" classification is checked. (Am. Compl. Ex. A at 5 of 9). Thus, the plaintiff acknowledged in his pleadings that Ms. Keshmiri was presented with the entire application, including the Agent's Report. He now, inconsistently, argues that Ms. Keshmiri never reviewed or assented to the classification. Yet, as the court will soon address, the plaintiff's claim is not supported by personal knowledge and, therefore, cannot be used to refute the grant of summary judgment.

The defendant has also established that Ms. Keshmiri's test results did not qualify her for the "super preferred" classification. Her cholesterol level was 229 and her HDL level was 3.8. Such test levels did not qualify Ms. Keshmiri for the "super preferred" rating under West Coast Life's underwriting rules. (Pl.'s Resp. DPFOF ¶ 22; Decl. R. Welker ¶ 6). Plaintiff's expert admits as much. (Decl. B. Reuter ¶ 2, Ex. A [Mitchell Dep. 221:11-25, 222:1-25, 223:1-7]). Therefore, the evidence tends to prove that Ms. Keshmiri was not insurable exactly as applied for.[7] Thus, the defendant has established that Ms. Keshmiri failed to satisfy the insurability condition precedent and that West Coast Life is entitled to judgment as a matter of law. Accordingly, the burden shifts to the plaintiff to set forth specific facts showing there is a genuine issue for trial. The plaintiff has failed to meet this burden.

---

[7]Ms. Keshmiri's initial test results also did not qualify her as a standard risk medically in the "super preferred" classification. (Decl. R. Welker ¶ 8, Ex. C).

The plaintiff attempts to create a factual dispute regarding whether Ms. Keshmiri actually applied for the "super preferred" classification. Yet, the court finds that the factual dispute is not genuine as the plaintiff has failed to establish that his personal affidavit attesting to the alleged fact in issue is made on personal knowledge. *See* Fed. R. Civ. P. 56(e)(1). As previously noted, affidavits that do not establish a basis for the affiant's personal knowledge are not admissible to support or resist the grant of summary judgment. *Visser v. Packer Engineering Assocs. Inc.*, 924 F.2d at 659. Though personal knowledge includes inferences and therefore opinions, the inferences and opinions must still be grounded in observation or other "first-hand personal experience." *Id.* "They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Id.* (citing *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989); *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir.1987)).

In arguing Ms. Keshmiri did not affirmatively request the "super preferred" classification or have any knowledge of its inclusion in her application, the plaintiff cites to his own affidavit and nothing more, even though he was not present at the meeting and application signing between Ms. Keshmiri and Mr. Alvine. (PPFOF ¶ 15-16). Indeed, plaintiff's affidavit simply states: "[N]otably, [Ms. Keshmiri] did not request 'super preferred' rates." (Tabatabai Aff. ¶ 6). He provides no foundation or support for this conclusion other than his subsequent statement that, "I have no reason to believe [the Agent's Report] was ever shown to or agreed upon" by Ms.

Keshmiri. (Tabatabai Aff. ¶ 6). This evidence is speculation about Ms. Keshmiri's actions in dealing, not with the plaintiff, but with Mr. Alvine and her meeting to review and sign the insurance application. His conclusions are certainly not grounded in observation. Further, the plaintiff gives no indication that his opinion in this respect is grounded in a "first-hand personal experience." Therefore, the court cannot allow the plaintiff to rely on these statements to resist the grant of summary judgment.

Furthermore, the court is also unconvinced that the alleged fact at issue set forth by the plaintiff in his affidavit would be admissible in evidence because it appears to be inadmissible hearsay. In determining a motion for summary judgment, a court may consider only admissible evidence. *Gunville v. Walker*, 583 F.3d at 985. Accordingly, a party may not rely upon inadmissible hearsay in opposing a motion for summary judgment. *Id.* As the court has already stated, "'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c); *United States v. Harris*, 281 F.3d 667, 671 (7th Cir. 2002). Though it is unclear on what Mr. Tabatabai bases his conclusion that Ms. Keshmiri never requested the "super preferred" classification, it appears it may stem from conversations he had with his wife about her meeting to fill out the insurance application and her conversations with Mr. Alvine. Assuming as much, Ms. Keshmiri's statements to the plaintiff, repeated by the plaintiff, were not made at a trial or hearing, and the plaintiff seeks to use them to prove that Ms. Keshmiri never requested the "super preferred"

classification. Thus, the plaintiff's version of Ms. Keshmiri's statements is not admissible and will not overcome a motion for summary judgment. *See Gunville v. Walker*, 583 F.3d at 985.

Consequently, the court finds that the plaintiff has not made a showing sufficient to establish that a genuine issue exists as to Ms. Keshmiri's election to apply for coverage under the "super preferred" classification. It is also undisputed that Ms. Keshmiri did not qualify for that rating classification due to her cholesterol and HDL levels. Therefore, the court finds that no genuine issue exists regarding Ms. Keshmiri's failure to satisfy this condition precedent to the CRA.[8]

## B.     The Doctrine of Prevention

The plaintiff's complaint also alleges that if Ms. Keshmiri is found not to have satisfied one or more of the conditions within the CRA, it was through no fault of her own, but rather due to West Coast Life's failure to promptly request a second urine specimen. Accordingly, plaintiff argues that West Coast Life should be barred from relying on the failure of the condition as a defense to the breach of contract claim. West Coast Life responds by arguing that a party must engage in actions *designed* to prevent performance of a condition for the condition to be excused. The defendant further asserts that the plaintiff has failed to cite to any evidence

---

[8]Even if the court were to assume Ms. Keshmiri did not request the "super preferred" classification, there is still no evidence to suggest that Ms. Keshmiri was insurable "exactly as applied for" on the date of her first urine and blood test because the results of this test did not even qualify her for the standard rate class, but instead at a rate 50 percent above the standard rate. (Mitchell Aff. ¶ 9).

demonstrating that West Coast Life engaged in conduct *designed* to prevent Ms. Keshmiri from satisfying the conditions precedent in the CRA.

The doctrine of prevention is the general principle in contract law that "if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused." 13 Richard A. Lord, Williston on Contracts § 39:3 (4th ed. 2000). In terms of conditions precedent, the doctrine prohibits a party from escaping liability on the ground that a condition precedent has not been met where that party has caused the failure of the condition. *See id; Park Properties Assoc., L.P. v. U.S*., 82 Fed. Cl. 162, 170 (2008). Furthermore, in Wisconsin, "a party whose obligation is dependent upon the occurrence of a condition must put forth a good faith effort to obtain the condition and must not hinder or prevent its occurrence." *1845 Co. v. 1845 Farwell Associates*, No. 87-2401, 1988 WL 143460, at *3 (Wis. Ct. App. Nov. 14, 1988) (citing *Doyn v. Ebbesen,* 72 Wis. 284, 288, 39 N.W. 535, 537 (1888)).

Applying this contractual theory in *N.L.R.B. v. Local 554, Graphic Communications Intern. Union, AFL-CIO,* 991 F.2d 1302, 1307-08 (7th Cir. 1993), the Seventh Circuit found that a union's dilatory behavior in failing to seek the signature of the international union president excused the express condition to the validity of a collective bargaining agreement requiring approval of the international union. Similarly, in *Rohde v. Massachusetts Mutual Life Ins. Co.*, 632 F.2d 667 (6th Cir. 1980), the court found that when a defendant-insurer acted in bad faith and

determined that an applicant failed to meet the defendant's standards for insurability, when insurability was a condition precedent to effectiveness of a CRA, then the defendant's own act prevented the occurrence of the condition precedent and, thus, the non-occurrence of the condition was excused. These cases suggest that a party relying on the non-performance of a condition precedent as a defense to contract formation, must have engaged in *purposeful* conduct or conduct *designed* to prevent or hinder the occurrence or performance of a condition precedent. Indeed, in addressing the issue, the Seventh Circuit stated that "[t]he Restatement (Second) of Contracts § 245 (1979), discusses the circumstances by which a party's *purposeful* non-performance of a contractual condition excuses its performance: 'Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'" *N.L.R.B. v. Local 554,* 991 F.2d at 1308 (quoting The Restatement (Second) of Contracts § 245 (1979)) (emphasis added).

As the court has already discussed, the evidence clearly demonstrates that West Coast Life requested a repeat urine test from Ms. Keshmiri before it postponed its underwriting of the application. Furthermore, there is no evidence to suggest that West Coast Life purposefully delayed in obtaining a second urine specimen so as to prevent Ms. Keshmiri from satisfying all the conditions of the CRA. Rather, the record clearly shows that West Coast Life promptly commenced the process of obtaining a second urine specimen once it received Ms. Keshmiri's first test results.

-23-

For instance, on July 6, 2006, shortly after Ms. Keshmiri's initial test results were confirmed, West Coast Life requested that O'Brien Financial obtain a second urine specimen from Ms. Keshmiri. On July 10, 2006, Mr. Alvine was alerted that a second urine test was necessary. On July 23, 2006, Mr. Alvine indicated to O'Brien Financial that Ms. Keshmiri was expecting a call related to scheduling a second urine test. As the court has previously discussed, it is reasonable to infer from this fact that Mr. Alvine informed Ms. Keshmiri before July 23, 2010, about the need for a repeat test. Furthermore, the plaintiff admitted to receiving a voicemail message from a nurse, sometime in late July or August 2006, informing Ms. Keshmiri that another urine sample was necessary. Though there does appear to have been a delay in the communication of the request to Ms. Keshmiri, the delay was, at its longest, less than a month, and there is no evidence to suggest that West Coast Life purposefully or actively delayed informing Ms. Keshmiri of the need for another urine test.[9] The plaintiff also fails to make any showing that West Coast Life's actions were not in good faith.

Even if the court were to conclude that West Coast Life purposefully delayed its request for a second urine sample, the evidence tends to show that the plaintiff and his wife significantly contributed to the non-occurrence of the condition. First,

---

[9]The plaintiff's expert also states that the delay in directly requesting the second urine specimen from Ms. Keshmiri was unreasonable and contrary to industry standards. (Mitchell Aff. ¶ 6). On the other hand, the defendant set forth evidence indicating that it was not unusual for a repeat urine test to take up to four weeks to complete. (Decl. B. Reuter ¶ 5, Ex. D [Hobbs Dep. 51:3-21]) (Docket #53-4). Even assuming the delay was contrary to typical industry practices, there is still no evidence tending to prove that West Coast Life's behavior was directed at preventing Ms. Keshmiri from satisfying the conditions precedent.

the plaintiff admitted receiving a voicemail message regarding the need for a second urine test  and making the decision not to call the nurse back to schedule the test. (Decl. B. Reuter, Ex. B [Tabatabai Dep. 68:1-10]).  Next, Ms. Keshmiri and the plaintiff spent nearly all of late July and August 2006 at the hospital, and so, were not at their residence to receive a call regarding the need for a repeat test.  Though their absence from home was understandable considering the circumstances, it does not change the fact that their absence is a likely reason that the request for a repeat urine test was not received promptly.  This same reasoning applies if the court assumes Ms. Keshmiri learned of the need for a test before July 23, 2006. The fault does not lie with West Coast Life simply because the proposed insured was hospitalized and unable to act on a request.

Thus, not only has the plaintiff failed to produce evidence that West Coast Life's delay in communication prevented Ms. Keshmiri from satisfying the conditions precedent, but the evidence suggests that the plaintiff's and his wife's actions significantly contributed to the failure of the condition.  Even if the court were to assume that West Coast Life prevented Ms. Keshmiri from completing the required tests so as to excuse the condition precedent, the plaintiff has still failed to demonstrate that Ms. Keshmiri satisfied, or would have satisfied with a repeat test, the insurability condition precedent.  Accordingly, the court finds that plaintiff has not shown that a fact affecting the outcome of the case is genuinely at issue in this regard.

### C. Implied Duty of Good Faith and Fair Dealing

The plaintiff also asserts that West Coast Life breached the implied duties of good faith and fair dealing present in every contract. *In re Chayka*, 47 Wis.2d 102, 176 N.W.2d 561, 564 (1970). The plaintiff claims that when the West Coast Life underwriter, Diane Hobbs ("Hobbs"), learned that Ms. Keshmiri had undergone recent brain surgery, Hobbs should have first determined whether the CRA was effective, and if Hobbs determined it was effective, she should not have considered the recent brain surgery and continued with the underwriting. This claim assumes that a contract existed, yet, as the court has just discussed, the evidence demonstrates that no contract ever arose between the parties because the conditions precedent to the CRA were not satisfied, nor were they excused. In Wisconsin, if there is no contract, the implied duty of good faith and fair dealing does not apply. *NII-JII Entertainment, LLC v. Troha*, No. 2006AP2204, 2007 WL 1695176, at *3 (Wis. Ct. App. June 13, 2007). Therefore, the defendant is also entitled to summary judgment on the good faith and fair dealing claim.[10]

## CONCLUSION

The court finds that no genuine issue of material fact exists as to any of the plaintiff's claims and that defendant is entitled to judgment as a matter of law. Though unfortunate, Ms. Keshmiri did not satisfy two conditions precedent to the

---

[10]The defendant has also set forth facts, undisputed by plaintiff, that it is proper to terminate the underwriting of an application upon learning of a material change in health, such as the brain tumor Ms. Keshmiri suffered from. (Decl. B. Reuter ¶ 2, Ex. A [Mitchell Dep. 74:16-25, 75:1-15]) (Docket #36-1).

CRA and, therefore, the contract for temporary insurance never became effective. The evidence also tends to show that the conditions precedent were not excused. Furthermore, the CRA was voided when West Coast Life did not approve Ms. Keshmiri's application within 90 days. For these reasons, West Coast Life is entitled to summary judgment.

Accordingly,

**IT IS ORDERED** that defendant's motion for summary judgment (Docket #32) as to all of the plaintiff's claims be and the same is hereby **GRANTED**, and this action be and the same is herewith **DISMISSED** on its merits, together with costs as taxed by the clerk of the court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of December, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge